***********
The Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At the time of the onset of the alleged occupational disease, the parties were subject to and bound by the provisions of the N.C. Worker's Compensation Act.
2. At the time of the onset of the alleged occupational disease, an employee-employer relationship existed between plaintiff and defendant-employers as follows:
 a. Signal Delivery Service/Leaseway Transportation — August 1970 through May 1992.
 b. Roadway Express — June 16, 1992, through April 12, 1997.
c. UPS — June 10, 1997 through the present.
3. The carriers for the defendant-employers are as follows:
 a. Signal Delivery Service/Leaseway: Old Republic Insurance/Gallagher Bassett Services.
b. Roadway Express, Inc.: self-insured.
c. UPS: Liberty Mutual Insurance Company.
4. In addition, the parties stipulated into evidence a notebook of medical records and reports.
5. Following the Deputy Commissioner hearing, the parties also agreed to stipulate that plaintiff's average weekly wage would yield the maximum compensation rate of $512.00 per week. The parties did not stipulate to an average weekly wage amount.
 ***********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. Plaintiff, who was forty-seven years old on the date of the Deputy Commissioner hearing and who is a high school graduate, has worked as a truck driver since August 1970 when he began working for defendant Signal Delivery Service (Signal Delivery). In that employment he drove tractor-trailers within a three-hundred-mile radius of the truck terminal and made five to ten stops along the route, mostly at Sears stores. In addition to the road work, approximately ten to twenty percent of his working hours were spent at the truck terminal because he was assigned the job of driving switchers, which were small tractors used to move trailers around the terminal yard. Like the truck tractors, the switchers had diesel engines but, unlike the trucks which vented exhaust through a stack at the top rear of the cab, the switchers vented their exhaust at the bottom rear of the vehicle, below a platform. The drivers assigned to work in the yard left the switchers running while they connected and disconnected the trailers.
2. Occasionally plaintiff was also required to shuttle trailers to the Sears mail order facility which was three to four miles away from the terminal. For this task, he drove cab-over tractors which also vented exhaust at the bottom rear of the vehicle. Like the switcher job, if assigned to shuttle trailers, plaintiff performed the task for a full ten to twelve-hour workday.
3. Plaintiff lost his job in May 1992 when Signal Delivery went out of business. The next month plaintiff began working for defendant Roadway Express (Roadway) as a casual driver. Within the year, however, plaintiff became a full time driver and drove routes of varying length. The longest route extended approximately five hundred miles from the terminal. Although all of the truck tractors used by the company vented exhaust at the top rear of the cab, plaintiff and other drivers noticed a smell which appeared to be diesel exhaust within the cab in some of the trucks as they were driving along the road. The drivers reported the problem but, after performing a study, the company concluded that the smell was coming from a different substance called blow-by which has a distinctive smell. Plaintiff and his coworkers Daniel Hill and Jerry Ring testified that they knew the difference between diesel exhaust and blow-by. Plaintiff's testimony regarding the smell of diesel exhaust fumes in the cabs of the trucks was corroborated by Mr. Hill and Mr. Ring, as well as by plaintiff's wife who testified that when plaintiff worked for Roadway his clothes reeked of the smell of diesel exhaust.
4. While working for Roadway, plaintiff generally did not have to drive switchers. However, there were several layoffs when truckers were offered switcher work on a temporary basis and plaintiff drove the switchers during those periods. However, most of the switchers had smoke stacks and did not vent exhaust near the ground.
5. Plaintiff was laid off by Roadway in April 1997 and during the layoff period obtained a job with defendant United Parcel Service (UPS) beginning June 10, 1997. Plaintiff was still employed by UPS on the date of hearing before the Deputy Commissioner. Plaintiff works as a feeder driver and drives tractor-trailers within a two hundred-mile radius of the facility. In addition, approximately twenty percent of plaintiff's time at work is spent driving switchers at the terminal, but all of the switchers have smoke stacks to vent the exhaust above the cab. However, plaintiff operates the switchers on the same lot where other diesel-powered vehicles are being operated. At the terminals, plaintiff backs his trailer up to the docks, connects and disconnects trailers on a daily basis, and builds doubles by connecting trucks to trailers. When plaintiff is at the UPS terminals, he can smell diesel exhaust.
6. In June 1995 plaintiff went to Dr. Sigmund Tannenbaum, a urologist, for complaints of urinary dripping, dysuria and a feeling of retention. Dr. Tannenbaum previously treated plaintiff for prostatitis, which was also Dr. Tannenbaum's assessment of the described symptoms at that time. The doctor performed a cystoscopy in July 1995 which revealed a normal bladder but swelling and inflammation in the prostatic urethra. Consequently, plaintiff was treated for prostatitis.
7. By May 1997 plaintiff was again having difficulty urinating and was subsequently referred by his family doctor back to Dr. Tannenbaum who examined him on July 31, 1997. By that time plaintiff was having severe voiding difficulties. Another cystoscopy and a biopsy were ordered at that time. The cystocopy revealed cystitis glandularis in a pre-cancerous state. Dr. Tannenbaum prescribed medication at that time. Plaintiff had an episode in early September 1997 where he could not void at all so he went to the emergency room. A catheter was inserted in order to drain plaintiff's bladder. Subsequently, Dr. Tannenbaum ordered a cytologic urine analysis. The test report was not issued until November 7, 1997. The laboratory found evidence of grade III urothelial cell carcinoma. Dr. Tannenbaum then ordered another cystoscopy and biopsy. This time the findings revealed invasive poorly differentiated transitional cell carcinoma, an aggressive cancer which originates in the superficial layer of the bladder but which can metastasize elsewhere in the body.
8. On December 15, 1997 Dr. Tannenbaum performed surgery to remove plaintiff's bladder, prostate, appendix and adjacent lymph nodes. Dr. Tannenbaum then used a section of small intestine to form a pouch which served as a bladder. Plaintiff was out of work from November 19, 1997 through May 15, 1998, when he was able to return to work for UPS. However, plaintiff developed some obstruction of flow from the left kidney and in September 1998 had to undergo a procedure to dilate the affected area and to insert a stent. Plaintiff's left kidney appeared to have significantly impaired function at that time.
9. Although there were a number of side effects from the extensive surgery he had undergone, plaintiff did well until April 2000 when a follow-up CT scan revealed a new mass consistent with recurrent cancer. A biopsy confirmed that the mass was transitional cell carcinoma which had metastasized to the left obturator lymph node. Consequently, plaintiff was referred to Dr. Bradley Sherrill, an oncologist. Dr. Sherrill recommended a course of chemotherapy followed by radiation which he anticipated would achieve a remission of the cancer although not a cure. Plaintiff subsequently underwent chemotherapy and the node shrank in size. Plaintiff underwent further surgery and then radiation treatment, but the medical records for that treatment were not placed into evidence. Plaintiff was out of work from this surgery from January 4, 2001 through February 12, 2001.
10. Dr. Tannenbaum initially advised plaintiff that his bladder cancer was likely due to his use of smokeless tobacco since plaintiff had used up to a can per day since 1973. Consequently, plaintiff filed a lawsuit against American Tobacco Company. However, the case was dismissed because there was insufficient scientific evidence to relate the cancer to plaintiff's smokeless tobacco use.
11. Plaintiff's attorney then sent him to Dr. Dennis Darcey, an occupational medicine specialist at Duke Medical Center. In forming his opinions about causation, Dr. Darcey relied upon medical research studies and literature. Dr. Darcy relied primarily on the research done by the International Agency for Research on Cancer (IARC) which found that diesel exhaust was a probable human carcinogen. Based upon plaintiff's significant 30-year exposure to diesel engine exhaust as a truck driver, Dr. Darcey stated that plaintiff's exposure in his employment was a risk factor in and contributed to the development of plaintiff's bladder cancer. Although the research literature contains articles both supporting and rejecting a link between diesel exhaust and bladder cancer, Dr. Darcey concluded that there were sufficient grounds to relate plaintiff's bladder cancer to his exposure to diesel exhaust fumes as a truck driver.
12. Dr. Darcey's report was provided to Dr. Tannenbaum, who concurred with Dr. Darcy's conclusions. Although Dr. Tannenbaum believed that plaintiff's exposure from smokeless tobacco may also have contributed to the bladder cancer, in his deposition Dr. Tannenbaum stated that plaintiff "had exposure that was intensive over a long period of time to a known carcinogen, that is to say, the hydrofluorocarbons in the diesel fumes, and I believe that's primarily the cause of his bladder cancer." Plaintiff's long, intensive exposure to diesel exhaust fumes from his work placed him in a higher risk category. Dr. Tannenbaum stated that he believed that the latency period for plaintiff's cancer was between the cystoscopy performed in 1995 that was normal and the cystoscopy in 1997 which showed precancerous lesions. Although continued exposure to diesel exhaust fumes did not lead to plaintiff's recurrent cancer in 2000, Dr. Tannenbaum believed and the Commission finds that continued exposure up until the time of diagnosis in November 1997 could have augmented or contributed to the disease.
13. Plaintiff's medical records were reviewed at defendants' request by Dr. Everett Anderson, a professor of urology at Duke Medical Center with over thirty-five years of experience. Dr. Anderson routinely treats patients with bladder cancer in the course of his practice but could not relate the diagnosis to any particular occupation and did not remember ever having treated a truck driver for the condition. Dr. Anderson reviewed the medical literature and found that the data was inconclusive and that no definitive association between diesel exhaust exposure and bladder cancer has been made.
14. Defendants also consulted Dr. Cary Robertson, another urologist at Duke. Dr. Robertson found that, although there had been considerable research on the subject, the results were so inconclusive that they did not meet the standards necessary to scientifically relate diesel exhaust exposure to the development of bladder cancer. Defendants also offered further evidence through Dr. Roger McClellan, a veterinarian and a diplomate of the American Board of Toxicology.
15. The expert witnesses disagreed as to the status of the medical community's acceptance of the causal link between exposure to diesel exhaust and bladder cancer. The results of the IARC study, however, show that diesel exhaust is a probable human carcinogen and a similar EPA study classifies diesel exhaust as a likely carcinogen. Therefore, the Commission gives greater weight to the medical causation opinions of Drs. Darcy and Tannenbaum than to Drs. Anderson and Robertson. The opinions of Dr. McClellan, a veterinary toxicologist and former CEO and President of the Chemical Industry Institute of Toxicology funded primarily by the chemical and oil industry, are given little weight.
16. The greater weight of the evidence shows that plaintiff was exposed to diesel exhaust fumes during the course of his employment with all three employers and that this exposure significantly contributed to the development of plaintiff's bladder cancer. The duties of plaintiff's employment created an intensive, long term exposure to diesel exhaust fumes and plaintiff was at an increased risk of developing bladder cancer than members of the public generally.
17. Plaintiff was last injuriously exposed to the hazards of diesel exhaust fumes that proximately augmented the disease of bladder cancer during his employment with UPS from June 1997 until his diagnosis in November 1997.
18. As the result of his compensable occupational disease of bladder cancer, plaintiff was disabled from any employment during the periods November 19, 1997 through May 15, 1998 amd from January 4, 2001 through February 12, 2001.
19. As the result of his compensable occupational disease of bladder cancer, plaintiff has suffered permanent injury to and the loss of his bladder and prostate gland, which are important internal organs. The loss of his bladder affects plaintiff's ability to void simultaneously and means that he will be required to catheterize himself intermittently to drain the urine. Because of the loss of his prostate gland, plaintiff has no ejaculatory function and little or no erectile function.
20. Defendant Signal Delivery and its carrier Old Republic Insurance moved that attorney's fees be assessed against plaintiff for having brought this action against them. However, in a case involving cancer, the latency period can be as long as fifteen to twenty years. The doctors' testimony regarding the latency period for bladder cancer was vague and there was nothing in the medical records which clearly addressed the issue. Consequently, plaintiff could not have known in advance which employer would be found to have the last injurious exposure should his condition be found compensable. Consequently, this claim was prosecuted against Signal Delivery and its carrier on reasonable grounds.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's bladder cancer is an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant-employers and which excluded all ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. §97-53(13); Booker v. Medical Center, 297 N.C. 458, 256 S.E.2d 189
(1979).
2. As the result of the contraction of a compensable occupational disease, plaintiff was temporarily totally disabled and is entitled to receive temporary total disability compensation for the periods November 19, 1997 until May 15, 1998 and from January 4, 2001 until February 12, 2001 at the rate of $512.00 per week. N.C. Gen. Stat. § 97-29.
3. As the result of his occupational disease, plaintiff is entitled to compensation for permanent injury to and the loss of his bladder and prostate gland, which are important internal organs. The reasonable amount of compensation for the loss of his bladder is $20,000.00; and the reasonable amount of compensation for the loss of his prostate gland is $20,000.00. N.C. Gen. Stat. § 97-31(24).
4. Plaintiff is entitled to have defendants pay for all medical expenses incurred or to be incurred as a result of plaintiff's contraction of a compensable occupational disease, as may be required to provide relief, effect a cure, or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25; -59.
5. Defendant UPS and its carrier Liberty Mutual Insurance Companies were on the risk at the time of plaintiff's last injurious exposure and are, therefore, liable for payment of compensation due plaintiff pursuant to the Act. N.C. Gen. Stat. § 97-57.
6. Defendant Signal Delivery and its carrier are not entitled to have attorney's fees assessed against plaintiff in that the claim was prosecuted with reasonable grounds against this employer. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant UPS and its carrier Liberty Mutual Insurance Companies shall pay plaintiff compensation for temporary total disability compensation at the rate of $512.00 per week for the periods November 19, 1997 through May 15, 1998 and from January 4, 2001 through February 12, 2001. This amount has accrued and shall be paid in a lump sum, subject to the attorney's fee awarded below.
2. Defendant UPS and its carrier Liberty Mutual Insurance Companies shall pay to plaintiff $20,000.00 for the loss of his bladder and $20,000.00 for the loss of his prostate gland. These amounts shall be paid in a lump sum, subject to the attorney's fee awarded below.
3. Defendant UPS and its carrier Liberty Mutual Insurance Companies shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable occupational disease.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraphs 1 and 2 of this Award is approved for plaintiff's counsel and shall be deducted from those sums and paid directly to plaintiff's counsel.
5. Defendant Signal Delivery and its carrier's motion to assess attorney's fees against plaintiff is denied.
6. Defendant UPS and its carrier Liberty Mutual shall pay the costs due this Commission.
This the ___ day of September 2002.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART:
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER